**Richard H. BEATTY et al., Plaintiffs,**

v.

**H. Dale BRIGHT et al., Defendants.**

**Civ. No. 8–2313–C–1.**

United States District Court,
S. D. Iowa, C. D.

July 21, 1972.

Ralph R. Randall, Richard H. Beatty, D. J. Fairgrave, Bradshaw, Fowler, Proctor & Fairgrave, Eugene Davis, Duncan, Jones, Riley & Davis, Des Moines, Iowa, for plaintiffs.

Leo Herzel and Franklin P. Auwarter, Chicago, Ill., James H. Carter, Cedar Rapids, Iowa, Richard R. Chabot, William B. McDonald, Austin, McDonald, Myers & Peterson, Des Moines, Iowa, Jerold S. Solovy and John G. Stifler, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

STUART, District Judge.

Plaintiffs brought this action for recision and damages with respect to a consummated merger of Gains Guaranty Corporation (Gains) and Life Investors, Inc. It arises out of proxy solicitation materials sent by the management of Gains to Gains shareholders to secure approval of the sale of substantially all of Gains assets to Life Investors, in return for stock in Life Investors. Judge Stephenson in his Memorandum and Order entered in this case September 24, 1970, D.C. 318 F.Supp. 169 (in ruling on

plaintiffs' Motion for Summary Judgment) held the proxy statement was misleading and violated the proxy rules of the Securities and Exchange Commission, particularly Rule 14a–9(a), in failing to make adequate disclosure relating to two shareholders derivative suits pending in Polk County, Iowa against Gains officers and directors and in failing to disclose management's interest in recommending approval of the sale. Such order established the liability of H. Dale Bright, John F. Sweeney, Ralph R. Torgersen, Reinhold O. Carlson, Stanley B. Friedman, William H. Myers, Donald R. Hargrave, Charles O. Russell and Robert A. Young (Gains defendants) for such violation.

By order entered May 19, 1972 as a result of a motion of the Gains defendants, it was stipulated that Judge Stephenson's Memorandum and Order implicitly included a finding that the Gains defendants were liable under section 10(b) of the Securities Exchange Act of 1934. 15 U.S.C. § 78j(b), as well as § 14(a), 15 U.S.C. § 78n(a), but "such finding does not carry with it a finding of scienter or fraud on their part or a finding of reliance by individual shareholders of Gains".

The matter is now before the Court on plaintiffs' Motion for Further Summary Judgment filed January 10, 1972, which asks summary judgment of liability against Life Investors' Inc., Ronald L. Jensen and Parnell E. Proctor, the acquiring corporation and its principal officers.

### Section 14(a)

Plaintiffs claim the uncontroverted facts and facts not in good faith controverted established as a matter of law that Life Investors, Inc., Ronald L. Jensen and Parnell E. Proctor are liable to them jointly and severally with the other defendants under Section 14(a) of the Securities Exchange Act of 1934 as amended, 15 U.S.C. § 78n(a) and Rule 14a-9 of the Securities Exchange Commission Rule 17 CFR 240.14a–9 because Life Investors had the right to dictate and did monitor, suggest and control the wording of the illegal proxy statement needed for the approval of the transaction and thus used the mails to solicit proxies in violation of Section 14(a) and Rule 14a–9.

Counsel for Life Investors indicated its quarrel was not with the evidentiary facts established but with the inferences to be drawn therefrom and the resulting legal conclusions. The Court is of the opinion that the following evidentiary facts have been established for the purposes of the Motion for Further Summary Judgment.

The portions of the Agreement and Plan of Reorganization between Gains and Life Investors pertinent to this motion in essence provided for Gains warranties that the consummation of the sale will not violate any law, that the Agreement will have been duly and validly authorized by all necessary corporate action by Gains, and that no instrument furnished by Gains will contain any material misstatement or omission. Life Investors' obligation to perform under the agreement was conditioned upon the truth of the representations made by Gains and was subject to its counsel's approval of the "legal form, content and sufficiency of the documents required to carry out the Agreement".

The following matters relate to the actions which tend to show the part Life Investors had in the preparation and approval of the proxy statement.

On July 19, 1968, Mr. Harvey L. Clark, resident attorney of Life Investors, sent a draft of the written part of the proxy statement relating to Life Investors to Mr. Breakstone of the Mayer firm (counsel for Life Investors) and asked his advice as to whether it would satisfy the S.E.C.

On July 29, 1968, Mr. Fredrickson of Peat-Marwick, CPA's for Life Investors, sent drafts of financial information for inclusion in the Gains proxy statement to Life Investors' comptroller with a copy to Wolf & Co., CPA's for Gains. These documents included combined pro forma balance sheets and statements of

operations for the two companies that appears as pages 14–16 of the final draft of the Gains proxy.

On July 31, 1968, Clark, wrote to Mr. William McDonald enclosing a copy of the written part of the Life Investors material for the Gains proxy statement, also stating that the financial information will be furnished by Peat-Marwick; and further suggesting that it be mentioned in the Gains portion of the proxy material that the name of one of the Gains directors will be submitted as an addition to the Life Investors board. The material relating to the directors was not included in the proxy material. Clark was within his authority for Life Investors in writing these letters and mailing these materials.

On July 31, 1968, Mr. John F. Sweeney of Gains sent a memorandum establishing a tentative schedule to "eveyone who had a part in the preparation" of the proxy and other documents, including the Mayer firm, Clark, Mr. Parnell Proctor and Peat-Marwick.

On August 2, 1968, Sweeney sent Breakstone copies of Gains financial statements that became schedules in the proxy.

On August 5, 1968, Sweeney wrote Breakstone about certain corrections in the footnotes to the financial statements.

On August 6, 1968, Clark wrote to McDonald making suggestions as to proxy requirements and enclosing information on Life Investors' directors.

On August 7, 1968, Sweeney wrote to Breakstone and Clark enclosing documents, including schedule 7(0), which describes the litigation in which Gains is involved. It points out that the derivative actions are against the officers and directors of Gains, mentions the amounts claimed, and reports that the petitions allege constructive fraud, negligence and mismanagement.

On August 12, 1968, Sweeney sent a preliminary draft of the proxy to the S. E.C. with copies to Clark and Breakstone. The description of the Gains liti-

gation does not contain the details given to Life Investors' attorneys previously.

On August 12, 1968, Sweeney wrote to the S.E.C., listing "material adjustments, other than normal and recurring accruals" entering into the June 30, 1968 statements of operations of Gains and its subsidiaries, presented in the proxy. A copy went to the Mayer firm.

On August 21, 1968, Sweeney had a phone conference with Mr. Rosenberg of the Mayer firm. Rosenberg reported he had gone over the documents with Clark and Proctor. Rosenberg asked Sweeney to send a copy of both complaints filed by Beatty and requested that Sweeney add to Schedule O or furnish a separate letter stating that the Beatty cases are derivative suits, subject to the indemnification provisions, and that the recovery would be to Life Investors rather than Gains. Rosenberg also made several specific suggestions for minor changes in the proxy statement. Proctor concedes that this and other conversations Rosenberg had with Sweeney regarding the Gains proxy material were within Rosenberg's authority as attorney for Life Investors.

On August 22, 1968, Sweeney wrote Breakstone the letter requested by Rosenberg concerning the Beatty litigation and enclosing the Beatty petitions. A similar letter was addressed to Life Investors and was attached to the contract when it was signed on August 22nd.

On August 26, 1968, Rosenberg called Sweeney about the Gains proxy statement. Rosenberg requested that the paragraph in the proxy relating to litigation be made more clear as to the recovery from the derivative suits being subject to indemnification and as to the disposition of the suits.

On September 5, 1968, Sweeney wrote to the S.E.C. enclosing a revised preliminary copy of the proxy material, set up in printer's proof. This copy contained the same material as the first draft and had been in preparation during August.

On September 12, 1968, Sweeney's secretary wrote Clark enclosing copies of pages on which there were changes keeping Clark up to date.

On September 12, 1968, Clark sent a copy of marked up proxy material to Sweeney's secretary.

On September 16, 1968, Clark wrote Peat-Marwick (copy to Sweeney) enclosing a copy of the Gains proxy, asking that any comments be phoned to Sweeney.

On September 17, 1968, Sweeney wrote Peat-Marwick (copy to Proctor) enclosing revised material on the Gains proxy. Life Investors' accountants, attorneys and home office were kept advised of the various stages of development of the proxy.

On September 30, 1968, the completed proxy statement and the Notice of Special Stockholders Meeting were mailed to the Gains shareholders. Under the heading "Litigation", at the top of page 33, appeared the following paragraph, which was not in the previous drafts:

"The Agreement specifically provides causes of action are included in the definition of the assets being purchased by Life Investors. Accordingly should Gains derive any benefits from these actions, such benefits would become the property of Life Investors."

The first page of the bound proxy statement that went to the shareholders is a President's letter to the Gains shareholders in which Mr. Bright states:

"This proposed plan reflects the judgment of the Gains management as well as Life Investors' management that the best method of growth and development is to join forces with another company."

Life Investors made no objection to the inclusion of this statement.

On October 18, 1968, Gains mailed out a revised and substituted page 1 of the proxy statement and a new notice, delaying the meeting to November 12, 1968.

(The sentence from the President's letter quoted above was not included in the one that went out with the revised notice, but attention was not called to this fact.)

On October 23, 1968, Clark wrote to Peat-Marwick, copy to Sweeney, concerning extra copies of the Gains proxy.

On November 12, 1968, the very date of the gains special meeting, Life Investors circulated a tender offer to the shareholders of Circle Key Life Insurance Co., which tender offer reprinted verbatim a large portion of the Gains proxy statement.

## ISSUE

Plaintiffs do not claim the uncontroverted facts show (1) collaboration, collusion or conipiracy between the Gains defendants and Life Investor defendants, (2) Life Investors actually solicited proxies, or (3) had voting control over Gains. The specific issue therefore is whether an acquiring company in a merger agreement which provides that all actions, proceedings, instruments and documents relating to the agreement shall be "approved as to legal form, content and sufficiency" by counsel for the acquiring company, becomes as responsible for misleading proxy statements as the soliciting management of the acquired company when it exercises the right of approval to the extent shown by the foregoing factual statements.

Plaintiffs recognize that in a number of cases in which an acquiring company has been held liable for inadequate disclosures in the proxy statement of the acquired company the acquiring company has had voting control of the acquired company. They argue that the control does not have to be voting control citing Myzel v. Fields (8th Cir., 1967), 386 F.2d 718, and state: "Here the ironclad contractual right of control over the content of the proxy statement held (and exercised) by Life Investors was every bit as effectual as voting control would have been; and its liability is no less clear than that of the acquiring companies in the Mills & Gerstle cases."

Plaintiffs argue: "It would appear that if Life Investors, through its attorneys, failed to recognize a material fact and failed to insist upon the inclusion of this material fact in the proxy statement, then Life Investors has violated Section 14(a) and Rule 14a–9(a). This is so because Life Investors attorneys could have objected that the proxy statement failed as to 'legal form, content and sufficiency'. Paragraph 12h of the Agreement can be read in no other way but that had the objection been made, Gains would have had to include the material fact.

"We may concede, for the purposes of this discussion, the truth of the affidavits of Mr. Rosenberg and Mr. Clark. It is still evident that the uncontroverted facts, or facts not in good faith controverted, establish that the proxy statement was a joint effort of Gains' attorneys and agents and Life Investors' attorneys and agents. It is true that Life Investors did not physically deposit the proxy solicitation materials in the mails. But, it jointly prepared the proxy statement with Gains, and the proxy statement itself was part and parcel of a solicitation. Once having begun to approve 'instruments and documents—as to legal form, content and sufficiency', Life Investors unquestionably and beyond all doubt brought itself within the purview of Section 14 and Rule 14a–9 (a)."

Plaintiffs have cited no authorities in which acquiring companies have been held responsible for misleading proxy statements under similar factual situations. In Mills v. Electric Auto-Lite (1970), 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 and Gerstle v. Gamble-Skogmo, Inc. (E.D.N.Y.1969), 298 F.Supp. 66, the acquiring companies had majority voting control. In Colonial Realty v. Baldwin-Montrose Chem. Co. (E.D.Pa. 1970), 312 F.Supp. 1296, the acquiring corporation had previously obtained working control through the ownership of 35% of the stock of the acquired company. Escott v. Barchris Construction Co. (S.D.N.Y.1968), 283 F.Supp.

643, involved § 11 of Securities Act of 1933, 15 U.S.C. § 77k which listed the persons liable for false or misleading statements in a registration statement and placed the burden on them to prove the use of due diligence to make a reasonable investigation as to the accuracy of the statements in order to avoid liability. In Myzel v. Fields (8th Cir., 1967), 386 F.2d 718, the liability of the controlling persons (for whom stock was being purchased) was placed on Section 20, Securities Exchange Act of 1934, 15 U.S.C. § 78t.

■ The Court is not persuaded the contract provision that all matters relating to the Agreement and Plan of Reorganization are subject to the approval of Life Investors' counsel and the exercising of that right to the extent shown here, makes Life Investor defendants liable as a matter of law for misleading statements contained in the Gains proxy statement. It would be reasonable to infer that these provisions were placed in the agreement to protect Life Investors, not to assume responsibility for the wording of the proxy statement. In the Court's opinion the contract provision, and Life Investors' activities under it do not establish such control over the Gains proxy statement to make Life Investors and its principal officers liable for misleading statements contained therein as a matter of law. Plaintiffs Motion for Summary Judgment against Life Investors defendants should be denied.

Passing reference was made by plaintiffs to Gould v. American Hawaiian Steamship Company (D.Del.1971), 331 F.Supp. 981, in which liability was founded on the theory that under Delaware law the surviving corporation after a merger is liable for any material misrepresentation by the acquired company as its successor. Here the merger was not accomplished under the Iowa statute, Section 496A.69 Iowa Code et seq., but through the sale of assets. Even under this statute the surviving corporation would be substituted for the acquired corporation. It is my understanding that Gains liability in the derivative ac-

tions would be limited to reimbursing the officers expenses should plaintiffs fail to recover. Judge Stephenson made no finding of liability on the part of Gains for the misleading statements.

### Section 10(b)

What has been said above relating to Section 14(a) and the proxy statement applies with equal force to the attempt to impose liability on the Life Investors defendants under Section 10(b). Therefore, plaintiffs Motion for Summary Judgment against Life Investors under Section 10(b) should also be denied.

### Interim Award of Expenses and Fees

D. J. Fairgrave and Eugene Davis, two of the attorneys representing the plaintiff class, have applied for an interim award of fees and expenses under Mills v. Electric Auto-Lite Co. (1970), 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 and have submitted detailed time statements. The Court is of the opinion that the application is premature.

In Mills the U. S. Supreme Court held that "petitioners, who have established a violation of the securities laws by their corporation and its officials, should be reimbursed by the corporation or its survivor for the costs of establishing the violation". pp. 389–390, 90 S.Ct. p. 624. As there is no specific statutory authority for the imposition of expenses and fees, the Court granted interim fees and expenses on the theory that those receiving benefits should share in the expenses. The Court concluded: "To award attorneys' fees in such a suit to a plaintiff who has succeeded in establishing a cause of action is not to saddle the unsuccessful party with the expenses but to impose them on the class that has benefitted from them and would have had to pay them had it brought the suit." pp. 396–397, 90 S.Ct. p. 628.

Here, parties are in agreement that Judge Stephenson's Memorandum and Order is interlocutory and is subject to appeal after final judgment. The appellate court would have the right to re-

verse the holding of liability. Thus, no benefit has been established until time for appeal has run or the decision has been affirmed. The Mills case involved a situation in which the judgment of liability had become final. The Court is of the opinion that interim fees and expenses should not be allowed on the theory of benefit until the benefit has become firm and final. If fees and expenses were awarded on the basis of an appealable trial court decision which was later reversed, the parties who were required to pay on the theory of benefit, would in fact have received no benefit. For that reason the request for interim attorneys fees is denied without prejudice to reassert the claim when the judgment of liability has become final.